## GADMOSKI v. PITNEY et al.
### No. 978.

District Court, M. D. Pennsylvania.
March 19, 1945.

Stanley F. Coar, David J. Reedy, and A. M. Ducks, all of Scranton, Pa., for plaintiff.

O'Malley, Hill, Harris & Harris, of Scranton, Pa., for defendants.

JOHNSON, District Judge.

This is a motion to set aside a verdict and to enter judgment for the defendants in accordance with the defendants' motion for a directed verdict, and, in the alternative, a motion for a new trial.

The case was tried before a jury. At the conclusion of the evidence the defendants presented a motion for a directed verdict which was refused. The jury returned a verdict in favor of the plaintiff in the amount of $12,000. Counsel for the defendants then filed the motions above stated.

The facts are as follows: The plaintiff, a man sixty years of age, was employed by the Glen Alden Coal Company. The place of his employment was at the Huber Colliery of that company in Luzerne County within the Middle District of Pennsylvania. His duties were those of an operator of machinery at the upper end of a tram-way used to convey rock taken from the mines of the coal company to a rock pile where the refuse was dumped. As the operator of the tram-way he occupied a shanty on the summit of the rock pile. The shanty was located about 2,800 feet from the scene of an accident in which the plaintiff was injured.

The premises of the Glen Alden Coal Company, known as the Huber Colliery, are adjacent to the main line and other tracks of the Central Railroad of New Jersey but are separated therefrom by a six-foot wire fence, except at one point, where, through an opening in the easterly line of the fence, a track known as the switch track enters the Huber yard. The switch track enters through the opening or gate and by a series of switches becomes six separate tracks which serve the colliery. The accident in which the plaintiff became involved took place near the gate, and, although the facts above recited are not disputed, the exact place where the accident occurred and the manner in which it happened became the subject of this action. The premises of the Glen Alden Coal Company, where these tracks are located, were used daily by 1,600 employees in going and coming from work.

The plaintiff testified that he worked on February 3, 1942 on a shift which began at 3:30 P. M. and ended at 10:30 P. M. At about 9:30 P. M. he received word that no more rock would be delivered to him that night and to come down from his shanty on the rock pile and file his report for that shift. It took him about one-half hour to make his way to the place within the colliery yard where he filed his report. It was then about 10 P. M. and he was not permitted to leave the colliery yard until 10:30 P. M. He then proceeded to the parking lot, located at the extreme southeasterly end of the colliery yard to find

his son who was to come for him in his automobile. The son had not arrived. The plaintiff then testified that he could not remember whether he had turned off the lights in his shanty. It was a part of his duty to extinguish those lights and the next shift did not begin until 7:00 A. M. He left· the parking lot and walked back through the colliery yard seeking a position from which he could see the shanty upon the summit of the rock pile. His line of vision as he walked was blocked by buildings, a lumber pile, a timber pile, cars upon the tracks, smoke from engines and smoke from the colliery works. He testified that he could not see the top of the rock pile until he had passed all of those obstructions. He came to the top of a five-foot bank which sloped downward toward the track on which the accident occurred. At the top of the bank he slipped upon the snow, went down the bank in an erect position and at the bottom of the bank caught his right foot in the switch rails on the southerly side of the track. He was unable to extricate his foot from the rails and as he bent down to unlatch the buckles of his artic in order to release his foot he heard a noise coming from the westerly direction in which he was facing. As he looked up he saw an engine of the railroad company coming toward him in reverse with the tender nearest to him. He could see the face of the operator in a railroader's cap as his head and shoulders protruded from the cab of the engine. He waived and shouted to the man on the engine to indicate his predicament but the engine did not slow down. He testified that the man in the cab was looking directly toward him as the engine continued toward him. He threw himself to one side and the wheels passed over his right leg above the ankle as the engine continued on its way. The engine did not stop after the accident. Relative to the ability of the man in the cab of the engine to see a person on the tracks, the testimony reveals that the premises of the Huber Colliery were so well lighted by flood lights that "you could pick a bolt up" and the "place was all lit up". The plaintiff further testified that he looked around for help and the only person he could see was down the track with a lantern. He then crawled toward a place of safety about ten feet from the place of the accident when the person down, the track came in answer to his cries and tied up his foot and ankle with a piece of wire or rope.

He then lost consciousness and remembered nothing until he was in the hospital. Other testimony shows that upon arrival at the hospital he was given a large dose of morphine to deaden his pain. The· plaintiff testified that when he regained consciousness at the hospital he saw his son and a priest but spoke to no one. His right foot was amputated above the ankle and later a re-amputation resulted in the loss of his right leg above the knee. The plaintiff was corroborated in his testimony by the deposition of his son Zachary, a military way-going witness, who stated that on the day of the accident he drove his father to work and made arrangements to call for him that night. In pursuance of those arrangements he did come for him and while at the parking lot in the Huber yards that night, at the request of the yard foreman, Peter Lucas, assisted another man in starting an automobile.

It was the contention of the defendants that the accident was caused by three freight cars drifting down grade through the gate and that the plaintiff received his injury thereby while standing on the tracks watching the Philadelphia Flyer pass on the main line track.

It should be mentioned at this point that the controversy over whether the plaintiff was inside the gate of the colliery where he was employed or outside the gate in the railroad yard is immaterial under the evidence. If the verdict in this case is permitted to stand it should be pointed out at this time that by the verdict the jury found the defendants negligent and that the negligence under the evidence was wanton. The question whether the plaintiff was a trespasser or not is therefore of no import.

The witnesses for the defendants were composed of the crew of the switching movement, the conductor of another train, a repair supervisor and a car inspector, two employes of the coal company and surveyors and photographers. The testimony of these witnesses will be reviewed.

On the night of the accident defendants' engine No. 301 was engaged in a switching operation. The crew consisted of Murray, engineer; Jordan, fireman; Gaughan and Barrett, brakemen; and Conroy, conductor. The testimony of these witnesses as to the occurrences on that night was as follows: Engine No. 301 with two coal gondolas and three freight cars attached

moved in a westerly direction on the tracks of the railroad company through the gate of the Huber yard with the engine headed in an easterly direction. No. 301 then backed up within the colliery yard on track No. 6 where the two coal cars were detached and left standing. The three freight cars, with a "Wabash" car as the most easterly of the three, were destined for the repair shops of the defendant railroad. In order to place the three freight cars in proper position on the tracks of the repair shops it was necessary to place the engine on the other end of the three freight cars and to push them over to the repair shop ahead of the engine and tender. Having so placed the three cars the engine could then back out of the repair shop tracks and proceed upon other duties. In order to accomplish that movement, after leaving the two coal cars on Track No. 6, the engine was moved down grade in an easterly direction toward the gate until the last of the three freight cars had cleared No. 5 switch. Then No. 5 switch was opened and the three freight cars were backed up on No. 5 track where they were left standing while the engine and tender were detached. The engine was then run down grade toward the gate again to clear No. 4 switch which was then opened so that the engine could back up on track No. 5. The engine was then in such a position that the three freight cars could proceed by gravity down grade, past the engine, through the gate and out upon the plane track. The engine, now behind the freight cars, could then proceed down grade for the third time in the switching movement, through the gate, and couple up behind the freight cars in proper position to push them over to the shop.

It was the contention of the defendants that the plaintiff was injured by the freight cars which were allowed to proceed alone down grade through the gate. In support of that contention defendants produced as witnesses the crew of No. 301, who testified as follows: John Murray, the engineer, that he was on No. 4 track with his engine awaiting a signal from the brakeman that No. 4 switch was set so that his engine could proceed down grade behind the freight cars. He saw the brakeman leave No. 4 switch and proceed down grade toward a place where he, Murray, could see two men with lanterns outside the gate. He then left his engine in charge of the fireman and walked down to the gate "to see what the trouble was". When he arrived at the gate the men were "gone down to the yardmaster's office". He followed them down there and "saw the man with the leg off". He did not take the engine out of the colliery yard for twenty to thirty minutes after that. When Murray left the yardmaster's office he went back to his engine. He testified that when he arrived there he examined the wheels of the engine. He was then asked the following questions on re-direct examination:

"Q. Did you examine the wheels of the tender also? A. No, just the drivers on the one side, the side where it happened, on the left side of the engine."

"Q. And what did you find if anything? A. I didn't find nothing."

Later, on re-cross examination he was asked: "Q. Why didn't you examine the wheels of the tender also?" He answered: "Because the front wheels would be the ones that would have to do what was done".

Peter Gaughan, a brakeman, went down to No. 4 switch to throw it so that the engine could get back on No. 4 track. He saw no one on a bank at that place nor one who had slid down a bank. After the three freight cars had gone down the grade, and while he waited at No. 4 switch, John Kehoe called to him from outside the gate. Gaughan ran down and found the plaintiff three or four feet outside the gate. This witness and Kehoe carried the plaintiff to the yardmaster's office in the railroad yard. On cross-examination Gaughan stated that he could see that night from track No. 6 down to the gate. He stated that as he walked down from track No. 6 to throw switch No. 4, so that the three freight cars could drift down grade, he looked down the tracks and saw no one down at the entrance gate. John Kehoe, conductor of another engine, on duty that night in the railroad yards was walking toward the gate of the colliery yard. When he was twenty or twenty-five feet from the gate he saw the three freight cars drifting down grade toward him. He watched the three cars come through the gate and stated that at that time there was no one between him and the gate. After the three cars had passed him he saw a man in a sitting position between the tracks about two feet outside the gate. Kehoe then shouted to the brakeman, Gaughan, to hold his engine. He testified that he then asked the plain-

tiff what had happened, "and he said he was watching the passenger train going by and the cars hit him". Kehoe and Gaughan carried the plaintiff to the yardmaster's shanty where the injured leg was tied up. Kehoe then went back to the gate and examined the rails. He testified that he found blood on the northerly side of the track directly across from where the plaintiff was found by him.

James Jordan, fireman of the switching engine, remained with his engine when the engineer, Murray, said "There must be something wrong down there * * * you take charge of the engine." Murray then got down from the cab and walked down the tracks. He saw two men carrying something down towards the yardmaster's office and when they reached the office he could see in the light from the shanty that the two men were carrying another man. Jordan testified that the engine, when Murray left it in his charge to walk down the tracks, was about 150 feet from the gate. He was not sure of the distance and said it was "just a guess". He did, however, mark the position of his engine at that time on defendants' exhibit No. 4, which is a scaled map and shows that this distance from the engine to the gate was at least 350 feet. Jordan could, therefore, see over 350 feet that night.

Joseph Barrett, the other brakeman, rode the last one of the three drifting freight cars down grade through the gate and stopped them on the plane track about 45 to 50 feet east of the gate. He descended from the car and looked back for the engine which he saw was still back on No. 4 switch. He then noticed two lanterns on the ground just outside the gate and walked back and saw an artic lying between the rails of the switch track. He went to the yardmaster's office where he heard the plaintiff tell the yardmaster, McCormick, "who had questioned him about his family and one thing and another, that he was standing on this track watching the flyer go by when something came down and hit him".

Nathan Kelly, night foreman for the Glen-Alden Coal Company, was in his office when he heard that Gadmoski had been hurt. He left his office and met one of the railroaders who told him that Gadmoski had been placed in a caboose. He boarded the caboose at the telegraph office and talked with Gadmoski. The conversation, according to this witness, was as follows: "I asked him what happened to him." "He told me that he was standing right outside of the Huber fence watching the passenger train go past when something came down and struck him, but he didn't know what it was". Upon cross-examination relating to the above-quoted conversation Kelly admitted that he could see Gadmoski was in pain, but stated that Gadmoski did not say a word about his leg. This witness stated that he went back to the colliery yard through the switch gate and examined the rails where he found blood on the northerly rail of the switch track about three feet outside the gate. Kelly was later recalled in connection with the photographic exhibits. Both sides had introduced photographs, some taken in the day light and others taken solely by means of the flood lights erected in the yards. The witness was asked if certain night photographs taken from various points in the colliery yard did not reveal the light on top of the rock pile where Gadmoski had worked. This was for the purpose of sustaining the contention of the defendants that it was not necessary for Gadmoski to have walked so far as he said he walked to see if the light on the rock pile was still lighted because those exhibits showed several points in the colliery yard from which the light on the top of the rock pile had been photographed. This testimony and the value of the exhibits was overcome on cross-examination as the photographs were not taken on the night of the accident but at some subsequent time and the witness was unable to state the heighth of the lumber pile, the heighth of the sand pile, the number of cars on the tracks or the number of engines on the tracks on the night of the accident. Although the exhibits in question showed several places in the colliery yard from which the light on top of the rock pile could be seen on the night the photographs were taken they did not reveal the conditions with which Gadmoski testified he was forced to contend on the night of the accident.

John McCormick, yardmaster at the Ashley Yard, testified that Gadmoski was brought to his office after the accident where he questioned him "as to what his name was". This witness stated that "he told me his name, his address, his dependents, his children, and where he lived; and I said to the man 'what happened Theo-

dore?' and he said 'I watched the passenger.'"

Upon cross-examination this witness could not remember anything about the injured man's clothing, foot wear, appearance, nor whether he had his eyes open during the conversation, but could remember well all the details of the extensive conversation related above.

M. F. Conroy conductor of the switching engine No. 301, testified that he walked ahead of the engine through the gate of the colliery yard and up into that yard as far as No. 6 switch when the two coal cars were detached. He then walked down through the gate again and stated that he did so for the purpose of protecting the plane engine, which he knew to be operating on the plane track below, against possible collision during the switching operation. Conroy stated that when the three freight cars had drifted down and had stopped he heard someone cry out. He then walked back toward the gate in the direction from which the cry came and saw other employees with an injured man about five feet outside the gate. He stated that he heard McCormick in the yardmaster's office ask Gadmoski his name and address, his marriage status, the number of his children and what he was doing at the place where he was injured. He testified that he heard Gadmoski answer the last inquiry by saying that he was standing there watching the Philadelphia Flyer go by and something hit him. On cross-examination he added the further statement by Gadmoski that he "said he was going to walk home, he got done early". This witness also testified on direct examination that the switching engine was brought down through the gate to remove the three freight cars from the plane track and when the train was out on the main track he stopped it, examined the wheels of the freight cars and found blood on the right-hand wheel of the first car.

Ernest Dickinson, Supervisor of Repairing and Inspecting railroad equipment, testified that he received an order to inspect the Wabash car. He found blood on the first right hand wheel. The inspection was made about 8 A. M. the following morning. On cross-examination he could not remember who told him to inspect the car; at what time he received his instructions to inspect the car; where the other two freight cars were at the time he made his inspection; nor whether the car door seal was broken or intact. He stated also that he received no orders to inspect the other two cars.

Thomas Rowley, car inspector for the railroad company, testified that he was called specially to inspect this one car out of the three at about 8 A. M. on the following morning and saw blood on the first right hand wheel.

Mary Mulherin, record librarian at the Mercy Hospital at Wilkes Barre, produced the record of Gadmoski's admission, diagnosis and treatment. The record contained a complete description of the patient; not only of the injury to his leg but a complete internal and external description of the condition of his body. The hospital record contains no mention of abrasions or contusions on the body of Gadmoski other than on the injured lower leg.

Dr. Martin T. O'Malley, called by the plaintiff as a medical expert in rebuttal, testified that Gadmoski must have suffered excruciating pain as one of the large nerves of the body had been severed or crushed.

It is evident, from the evidence above recited, that the jury found it necessary to choose between two widely divergent versions of the accident. The decision lay between the version presented by the plaintiff and that presented by the group of railroad employees. The verdict was in favor of the plaintiff and the present question for determination is whether the jury was warranted in finding from all the evidence that the accident resulted solely through the negligence of the defendants.

The witnesses for the defendants were superficially in accord in their testimony, but upon examination inconsistencies are revealed. Those inconsistencies together with certain probabilities and deductions from the physical facts involved, as well as the doubtful credibility of some of the witnesses, were such, in the opinion of this court, as to make the verdict a proper one.

Although a greater number of witnesses testified in behalf of the defendants, the weight to be given that testimony and the credibility of the witnesses was for the jury.

The deposition of Dr. Edward S. Dougherty was placed in evidence by the defendants. From the deposition the jury heard that Gadmoski, while at the hospital await-

ing amputation of his leg, conversed with Dr. Dougherty and told him that he had finished work and was taking a short cut home across the Central Railroad tracks and did not hear the approaching train until he was struck. But the jury also learned from this deposition that Dr. Dougherty called two doctors to attend Gadmoski at the hospital; one of whom was regularly employed by the Glen Alden Coal Company and the other regularly employed by the Central Railroad of New Jersey. Each doctor was employed for the purpose of treating the employees of the company by which he was retained. The jury was entitled to believe that if Gadmoski had stated to Dr. Dougherty that he was injured on railroad property while taking a short cut home across the Central Railroad tracks, then Dr. Dougherty would have called only the doctor for the Central Railroad of New Jersey. The jury might have reasoned that Dr. Dougherty would have called both the doctor for the mining company and the doctor for railroad company only if he had been in doubt as to where the injury occurred.

It was also proper for the jury to consider the physical and mental condition of Gadmoski at the time he was alleged to have made the statement referred to above. He had suffered such a crushing injury to the lower leg that those men who gave him emergency treatment had turned his foot and ankle up against the stump of his leg and had bound it there with wire or rope. Dr. Martin T. O'Malley, called and qualified as an expert medical witness by the plaintiff, testified that one of the large nerves of the body had been crushed or severed and that Gadmoski suffered intense and excruciating pain; so much so as to require a large dose of morphine to relieve his suffering. The jury was entitled to consider whether Gadmoski was suffering so intensely as to preclude conversation and explanations.

The jury was also entitled to entertain the same doubt with regard to the conversations between the plaintiff and the switching crew, the yard-master and the night foreman. Those conversations have been related herein, and whether Gadmoski was suffering too intensely to engage in such lengthy conversations was a matter properly to be considered by the jury. The conversation with John McCormick in his yardmaster's office as told by McCormick was so lengthy as to include the injured

"man's name, his address, his dependents, his children, and where he lived" as well as an explanation of how and when the accident occurred. The jury might have considered such an extended conversation to be impossible to a man suffering as Gadmoski was and consequently may have refused to believe defendants' witnesses.

There are also physical facts in this case which are incompatible with defendants' theory. If the railroad employees are to be believed, Gadmoski stated to them that he was standing on the Central Railroad tracks watching the Philadelphia Flyer go past when he was struck by something which he did not see. It was the contention of the defendants throughout this case that Gadmoski received his injuries by being struck by the box cars being drifted down to the gate. It was the witnesses for the defendants, called to testify in support of that contention, who related an alleged admission by Gadmoski that he was injured by an unseen object while watching a passing passenger train. But the hospital record reveals that a comprehensive examination of Gadmoski's body at the time of his admission to the hospital showed no marks of injury except that to his lower leg. If Gadmoski had been struck by the box cars and had not seen nor heard them before he was struck he would have incurred extensive abrasions and contusions of the upper part of his body. The frame or body of the box car projecting over and in front of the wheels would have been the part of the car which would have struck Gadmoski. That he was not injured in that manner is shown conclusively by the hospital records.

Another matter to be considered by the jury as bearing upon the weight to be given the testimony and on the credibility of some witnesses was the attitude exhibited on cross-examination by those of defendants' witnesses who were asked for various measurements of standard box cars. Counsel for the plaintiff in support of the contention that Gadmoski could not have been injured by the box cars cross-examined a number of defendants' witnesses in an attempt to secure information for the benefit of the jury showing the heighth of the body of a standard box car above the ground and the distance the body of a box car projected over the wheels at the sides and the ends. The cross-examination failed to produce the approximate measurements requested but did reveal the follow-

ing attitude on the part of the witnesses examined: Peter F. Gaughan, who had 26 years of experience as a trainman stated that he was unable to give "any idea" of the measurements asked for. For three pages of the transcript of the testimony comprising 29 questions on the subject he resisted all efforts to elicit information. Joseph Barrett with 26 years of railroading experience would not give the jury "any figure at all" of the approximate distance from the end of a box car to the wheels of the car. Ernest O. Dickinson, Supervisor of Repair and Inspection for the Central Railroad with 20 years of experience in that capacity in cross-examination extending over ten pages of the transcript and comprising 218 questions avoided giving any information other than the distance from the rail to the bottom of the under carriage of a box car is about 24 or 38 inches. Thomas Rowley, with over 26 years of experience as a car inspector, was asked to state how far back the wheels were from the end of the Wabash car, which was the leading car of those drifted down the slope, and which he had inspected particularly, and he refused to give any measurement. The examination of Rowley covers four pages of the transcript and comprises 70 questions. It was apparent to the trial judge that these witnesses were avoiding questions to which they must have known the answers and the jury was entitled to give such a matter consideration in arriving at the weight to be given the testimony of these witnesses as well as their credibility, and would be warranted in disbelieving their testimony.

There are inconsistencies in the contention of the defendants that Gadmoski was struck by the drifting box cars. The inconsistencies were revealed in testimony of defendants' witnesses. Two of defendants' witnesses testified that they looked at the gate at the time the box cars drifted down the slope and passed through the gate. Peter F. Gaughan, the brakeman who threw No. 4 switch to let the cars drift down, looked down at the gate and saw no one there. John Kehoe, conductor of the plane engine, was walking toward the gate from the direction of the railroad yards. He was about 25 feet from the gate when the drifting cars came through. He was watching the cars and there was no one between him and the gate. Here were two witnesses who looked at the gate as the box cars drifted down; who were observing the gate from opposite directions, and who saw no one at the gate. These witnesses were called to testify by the defendants and the jury would have been warranted in refusing to believe the contention and theory of the defense that Gadmoski was injured by the box cars. The only other moving vehicle in the colliery yard was the switching engine. If the members of the jury believed the box car did not injure Gadmoski then they must have believed the switch engine caused the injury.

The testimony of the engineer of the switching engine on redirect examination must have had its effect upon the jury. As hereinbefore stated, after testifying that after the accident he examined the wheels of the engine for blood marks, he was asked "did you examine the wheels of the tender also". He replied, "No, just the drivers on the one side, the side where it happened on the left side of the engine".

■ The case was properly one for submission to a jury and the jury was warranted in finding in favor of the plaintiff. The motion to set aside the verdict and for judgment for the defendants must be dismissed.

In support of the alternative motion for a new trial the defendants have assigned a number of reasons which will now be disposed of.

■ The defendants state "The learned court erred in allowing testimony of a photographer that his eyes did see what his camera shows in the pictures he took". Reference to the testimony shows that the purpose of the question was to establish that certain lights were not moving lights but were stationary. In any event it is proper and customary to ask such a witness whether the photographs which he took and which are to be introduced in evidence are accurate representations of the subject matter as he saw it at the time he took the photograph. There is no merit in this reason and it must be dismissed.

■ The defendants further state that "The learned court erred in allowing testimony of a photographer who took pictures on a later night than that of the accident, that he had no difficulty at all walking around the grounds where he placed his camera." The purpose of the line of questions asked of this witness was to show that although the pictures taken were time exposures of ten to fifteen minutes' dura-

tion, there was, nevertheless, sufficient light to enable him to see his way clearly. There was further questioning to show that if there had been as much snow on the ground on the night the pictures were taken as there was on the night of the accident the illumination would have been greater by reason of the reflection of the light on the snow. These questions were asked because counsel for the defendants had asked this witness on cross-examination if the lengthy time exposures were not required because the light was dim. In this manner counsel for the defendants opened the door for the questions to which they now object. No harm was done the defendants by the explanations made by this witness and this reason must be dismissed.

The defendants further state that "The learned court erred in not explaining to the jury, when requested by the defendants, that plaintiff's counsel was mistaken in saying to the jury the defense in this case is an affirmative defense." The request of counsel for the defendants was as follows: "May it please the court, will your Honor at this point instruct the jury that counsel for the plaintiff is mistaken when he says that the defense in this case is an affirmative defense and the burden of proof is on the defendant to show it". The trial judge replied "Well, I will take that matter up when I come to my charge". In the charge to the jury the trial judge fully covered the burden of proof resting upon the parties. No harm has been done the defendants and this reason must be dismissed.

The defendants further state that "The learned court erred in not instructing the jury that the fact that the surgeon who operated on the plaintiff was the physician for the Glen Alden Coal Company is not evidence that the plaintiff was hurt on Glen Alden property". It was not error to fail to instruct the jury in this manner. Dr. Edward Dougherty, a nephew of Dr. Joseph Dougherty, received the call from the yardmaster's office after the plaintiff had been injured. In the absence of Dr. Joseph Dougherty, who was retained by the Central Railroad Company, Dr. Edward Dougherty directed that Gadmoski be given emergency treatment and be transported immediately to the hospital. While at the hospital, as has been related hereinbefore, Dr. Edward Dougherty talked with Gadmoski. He testified that during that conversation Gadmoski stated he was injured while taking a short cut home across the railroad company's tracks; that he heard no approaching train, and his first knowledge that something was wrong was when he was struck. This goes to the very heart of one of the disputes of fact. Dr. Dougherty, despite the alleged statement of Gadmoski, called a Glen Alden doctor and a Central Railroad doctor to attend Gadmoski at the hospital. He stated, under cross-examination, that he did so because he did not know whether the responsibility was that of the railroad company or the coal company. His own statements are contradictory. This was a matter to be decided by the jury and not one for instructions by the trial judge. Moreover, no exception was taken to this matter after the charge. This reason is without merit and must be dismissed.

The next reason assigned by the defendants in support of the motion for a new trial is that "The learned court erred in not telling the jury the way the plaintiff said in his complaint the accident happened". The complaint was not introduced in evidence and the trial judge refused to allow any part of the pleadings not in evidence to be read to the jury. The later refusal so to charge was based upon the fact that the complaint was not a part of the evidence. This was not error and this reason must be dismissed.

The next reason assigned is that "The Court put undue emphasis upon what the court called the contentions of the parties, did not distinguish between contentions and evidence, did not tell what the contentions were, as shown by the pleadings, treated the testimony as contentions instead of evidence, and so did not give the jury a proper conception of the true basis for inferences, and did not make it plain to the jury that inferences of fact must be drawn from the evidence alone". No specific allegation is contained in this assignment and no reference is made to any specific part of the charge. The assignment contains five reasons as it is drawn. The charge of the court was full and specific. The contentions of both parties were related to the jury in order that a full understanding of the facts and the dispute between the parties might be made clear. At the conclusion of the presentation of defendants' exceptions before the jury retired the trial court charged the jury as follows: "Of course, contentions are not

evidence. I mentioned the contentions to show what the claims are in their arguments and in their evidence. In other words, the plaintiff makes a contention. If that is all he does, there can be no recovery on a contention. But he makes his contentions first, and the defendants make their contentions first, and then they follow those contentions with evidence. It is the evidence which controls". The jury received proper instructions and this reason must be dismissed.

■ The next reason is that "The Court's iteration and reiteration of the plaintiff's version of the accident tended unduly to invoke sympathy of the jury". As the trial judge stated in his charge "the defendants' contention can be stated in a few words, while the plaintiff's cannot be. The burden is on the plaintiff all the way through, and that very fact requires an analysis of the plaintiff's claim, dividing it up, and the fact that more time is taken really shows that more burden is on the plaintiff". This was adequately covered and this reason must be dismissed.

■ The next reason is that "The Court used language implying there could be an inference of wanton negligence of persons operating the engine, without reference to any individual". The trial judge charged "Wanton negligence or gross negligence here would be when the engineer or person in charge of this engine had become aware in time of the plaintiff's predicament, of his peril, and he disregarded that knowledge, and with the knowledge of the plaintiff's peril continued instead of stopping". This was a sufficiently adequate description without reference to the person in charge of the engine by name. No harm was done the defendants and this reason must be dismissed.

■ The next reason is that "The Court impliedly, and in words, said the jury must decide in favor of the plaintiff". No reference is made to any specific portion of the charge to support this reason. No such portion of the charge can be found. This reason must be dismissed.

■ The defendants further allege that in his charge to the jury the trial judge unduly detracted from defendants' points for charge from point 1 to point 7, inclusive. Each of these points was affirmed. In referring to the subject matter of the points the trial court explained each point to the jury and instructed that although that particular point was affirmed it was the duty of the jury to weigh the testimony, determine the credibility of the witnesses, the interest or disinterest of each witness and the questions of fact involved in order to arrive at the truth, in accordance with the instructions in the general charge. There was no error committed and these reasons must be dismissed.

■ The last reason assigned is that "The Court did not respond to the defendants' exceptions (551–558), by curing the therein indicated errors and defects in the charge". At the time the exceptions were presented the trial judge carefully considered the contents thereof and before the jury retired gave additional instructions based upon the exceptions. This matter was adequately covered and no error was committed. This reason must be dismissed.

The remaining reasons are those numbered five to twelve, inclusive, on page four of "Defendants' Specific Assignments". These reasons consist of allegations that the trial judge made insinuations in favor of the plaintiff; that he belittled the credibility of defendants' witnesses; that he belittled the value of a number of witnesses as to a fact; that he brought foreign subjects into his charge to the detriment of the defendants; that he did not clearly define the issues, and other similar matters, all without foundation in fact. These reasons must also be dismissed.

And now, March 19th, 1945, the motion to set aside the verdict and for judgment for the defendants is dismissed. The reasons assigned in support of the motion for a new trial are dismissed and a new trial is refused. The Clerk of the Court is hereby directed to enter judgment on the verdict after giving ten days' notice hereof to counsel of record.